

**SO ORDERED.**

**SIGNED this 28 day of February, 2013.**

_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
NEW BERN DIVISION

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **RICKY LEE BUMGARDNER** | **10-09785-8-SWH** |
| **DEBTOR** | |

### ORDER

The matter before the court is the confirmation of the debtor's chapter 11 plan. The bankruptcy administrator objected to the plan and the initial disclosure statement. Bank of America objected to the plan and the debtor's first amended disclosure statement. A hearing was held in Raleigh, North Carolina, on November 6, 2012. The court took the matter under advisement and solicited the filing of post-hearing memoranda by December 6, 2012.

### BACKGROUND

The debtor is currently the owner of ten properties in Onslow County, North Carolina. His primary liabilities are those incurred for the purchase of his residence (the "Marital Residence"), two triplexes, two single-family rental properties, and an undeveloped lot referred to by the debtor as the "Telephone Pole Lot." The debtor owned two additional properties at the time he filed his petition,

but voluntarily surrendered both to PNC Bank post-petition.[1] The Marital Residence is owned by the debtor and his non-debtor wife and secures a loan from First Federal Bank ("First Federal"); the remaining nine properties are titled in the debtor's name only. Each unit in the triplexes has a distinct address, and those six units along with the two single-family properties secure debts to JP Morgan Chase Bank ("Chase") (collectively, the "Chase Properties"), all eight of which the debtor rents out year-round as his primary source of income. The Telephone Pole Lot is security for a debt to PNC Bank.

The debtor also owns interests in a number of business entities: Alliance Construction Corp of NC, Inc. (49% interest); Alliance Electric, Inc. (100% interest); Alliance Reconstruction and Restoration, Inc. (25% interest); JDR Motors, Inc. (35% interest); and Rick's Eating Establishments, Inc. (25% interest). The debtor is also a manager of Alliance U.S. Properties, LLC ("Alliance U.S. Properties"), which is owned by his wife and father-in-law. Alliance U.S. Properties owns a condominium in Wilmington, North Carolina, which is subject to a deed of trust to Chase (the "Wilmington Condo").

The debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on November 29, 2010, and filed a disclosure statement and plan of reorganization on July 8, 2011. The disclosure statement was conditionally approved on July 11, 2011. On September 2, 2011, Bank of America and the Bankruptcy Administrator filed objections to the disclosure statement and plan. On January 10, 2012, the debtor filed a ballot report, indicating that all creditors except Bank

---

[1] These two properties, which were subject to the claims of RBC Bank (now PNC Bank) in Classes 13 and 14 of the debtor's plan, were surrendered pursuant to a resolution between the debtor and PNC Bank which was incorporated into an order entered by the court on March 15, 2011.

2

of America accepted the plan.[2] The disclosure statement and confirmation hearing was initiated on January 11, 2012, during which the debtor orally amended both documents. The court conditionally approved the orally modified disclosure statement and on January 23, 2012, the debtor filed an amended disclosure statement and amended plan which incorporated the oral modifications.

After the confirmation hearing was continued twice (once by the debtor and once by PNC), the debtor filed a second ballot report on June 12, 2012, which showed conflicting ballots from PNC regarding one claim, but otherwise reflected the same votes by all creditors as the January 10, 2012 ballot report. The confirmation hearing was reconvened on June 13, 2012. A motion for relief from stay filed by PNC was also calendared on that date. The court heard the ballot issues and the PNC stay motion on June 13, 2012, and recalendared confirmation for a later date.[3] The debtor filed a third and final ballot report on September 11, 2012, indicating that all impaired classes voted to accept the plan except Class XVI, the general unsecured class. Bank of America was the sole creditor in the rejecting Class XVI. The confirmation hearing resumed on September 12, 2012, and at the hearing the debtor again orally modified his plan to increase payments to unsecured creditors and to address the absolute priority rule set out in 11 U.S.C. § 1129(b)(2)(B)(ii). The debtor filed a second amended plan on September 17, 2012 to reflect these changes.[4]

---

[2] Chase and First Federal's acceptances were conditioned on the debtor filing an amended plan which would reflect modified treatment of their respective claims.

[3] PNC's conflicting ballot reports and the motion for relief from stay were addressed together in an order issued by the court on July 17, 2012.

[4] The court did not require the debtor to reballot the second amended plan, finding that it offered more beneficial treatment to unsecured creditors and did not adversely affect accepting secured creditors.

In general, debtor's second amended plan of reorganization (the "Plan") contemplates continued ownership of the Marital Residence, the Chase Properties, and the Telephone Pole Lot, with the debtor reserving the right to surrender or liquidate all or a portion of those assets to pay secured creditors. Claims will be paid primarily through the proceeds of the rental income derived from the Chase Properties. The debtor proposes to pay $24,000, together with interest at a fixed rate of 1.5% per annum, to unsecured creditors in bi-annual installments over 60 months, which amount is based on the debtor's projected disposable income over the term of the Plan pursuant to 11 U.S.C. § 1129(a)(15)(B). Finally, the Plan states that the debtor will invoke the "new value exception" to the absolute priority rule, if necessary to overcome the objection of a rejecting impaired unsecured class.

The debtor's Plan sets forth sixteen classes of creditors, three of which are unimpaired. Thirteen classes--Classes IV through XVI--are impaired, and, as the latest ballot report indicates, all of those impaired classes, with the exception of Class XVI, have accepted the plan. Bank of America has the largest general unsecured claim, originally listed at $5,102,450.21 and arising out of a promissory note that was executed by Alliance Construction Corp of NC, Inc. and guaranteed by the debtor in favor of Bank of America.[5] Bank of America filed an amended proof of claim on October 11, 2012, reducing its claim by approximately $1.5 million to $3,592,243.22. As a result, the estimated aggregate amount of liquidated unsecured claims against the debtor is $5,043,959.22.[6]

---

[5] The debtor filed an objection to this claim on September 11, 2012, but since a rejecting ballot vote by Bank of America, even if it were reduced significantly, would still be large enough to carry the unsecured class, the hearing on the objection to claim was continued indefinitely.

[6] According to the first amended disclosure statement, several of the debtor's unsecured claims are unliquidated, so the exact amount of each is contingent upon liquidation. Only unsecured claims with ascertainable amounts listed on the first amended disclosure statement, exclusive of Chase's unsecured claims after bifurcation, are included in this figure.

At the hearing, the debtor testified regarding the contents of the Plan and the estimated income and expenses related thereto. The debtor described his business activities managing the Chase Properties, and the costs associated with maintaining each property in rentable condition. The debtor introduced a five page exhibit ("Exhibit 1"), setting forth a one page budget showing the debtor's projected business and personal expenses over the duration of the Plan (the "Budget") and four pages of explanations by the debtor regarding past expenses associated with the Chase Properties. The debtor also testified that upon confirmation, the money accumulated in the DIP account from rental of the Chase Properties will be used to reimburse Chase for expenses advanced on behalf of the debtor post-petition, with the remainder to be allocated for the payment of ongoing expenses related to the Chase Properties. The debtor testified that he is in the process of preparing the Wilmington Condo for rental, will be responsible for making payments to Chase on that property, and will be entitled to all rental proceeds. The debtor estimated his interests in Alliance Construction Corp of NC, Inc.; Alliance Electric, Inc.; Alliance Reconstruction and Restoration, Inc.; and JDR Motors, Inc. to have a value of $0.00, and his interest in Rick's Eating Establishments, Inc. to be worth $10,000.

The debtor testified that if the court found his vacation budget of $1,800 a year to be unreasonable, he would devote more money to his unsecured creditors by adding the amount subtracted from his vacation budget to his projected disposable income. The debtor also orally amended the "new value" contingency proposed under the Plan to provide that if he was required to overcome the absolute priority rule as a condition to confirmation, the debtor's non-filing wife,

Mrs. Linda Bumgardner, would pay $15,000 from her own assets on the Plan's effective date as an infusion of new value into the Plan.[7]

Bank of America contends that the first amended disclosure statement does not provide adequate information to the debtor's creditors. Bank of America also contends that the Plan was not filed in good faith, is not feasible, and fails to devote all of the debtor's projected disposable income to pay unsecured creditors. The bankruptcy administrator asserts that the Plan does not satisfy good faith standards and is potentially not feasible; the bankruptcy administrator maintains that the debtor has overestimated his expenses and therefore underestimated disposable income. Both Bank of America and the bankruptcy administrator assert that Mrs. Bumgardner's proposed contribution of $15,000 to the Plan fails to satisfy the applicable standards for "new value." At the conclusion of the hearing, the court took approval of the disclosure statement and confirmation of the Plan under advisement and solicited memoranda from the debtor, Bank of America, and the bankruptcy administrator on the contested provisions of 1129(a) and (b). The debtor, Bank of America, and the bankruptcy administrator filed written memoranda on December 6, 2012.

## DISCUSSION

### The Disclosure Statement

A debtor must provide all holders of claims or interests with a disclosure statement with "adequate information" as defined by § 1125(a)(1). Bank of America asserts that the debtor did not

---

[7] The plan originally proposed to provide "new value" by having Mrs. Bumgardner waive her Homestead Exemption in the Marital Residence and any other tenancy by the entireties rights, and allow the debtor to encumber the Marital Residence with a deed of trust securing a debt in the maximum amount of $15,000. Debtor would then execute a note in favor of the holders of allowed unsecured claims under his plan. The parties stipulated at the hearing that the amended proposed form of new value was more clearly from an outside source in money or money's worth than the original form proposed in the plan.

provide creditors with "adequate information" regarding the debtor's valuations of his assets, the debtor's projected disposable income, or why the Plan satisfies the absolute priority rule. Both because the debtor addressed these issues at the hearing, and because Bank of America is a sophisticated entity capable of making informed decisions about the debtor's assets, the court hereby approves the debtor's disclosure statement and moves on to its examination of the debtor's Plan. See In re Bath Bridgewater South, LLC, 2012 Bankr. LEXIS 4353 (Bankr. E.D.N.C. Sept. 20, 2012).

### The Plan

**1129(a)**

A plan must satisfy the provisions of § 1129(a) to be confirmed. In re Sea Trail Corp., 2012 Bankr. LEXIS 4985 (Bankr. E.D.N.C. Oct. 23, 2012). If a plan satisfies all the provisions of § 1129(a) except § 1129(a)(8), the plan may still be confirmed if there is at least one impaired accepting class and the court finds that the plan is fair and equitable in accordance with § 1129(b). Id. There are twelve accepting impaired classes, and only one rejecting impaired class. Therefore, the court has authority to consider cram down if the debtor's plan satisfies the § 1129(a) requirements, other than § 1129(a)(8). The court will therefore first discuss objections lodged regarding the § 1129(a) requirements.

Good Faith

Under 11 U.S.C. § 1129(a)(3), a plan must be "proposed in good faith and not by any means forbidden by law." A good faith inquiry should consider the totality of the circumstances surrounding a debtor's plan. In re Piece Goods Shops Co., L.P., 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995). Two of the tests for determining whether a plan has been filed in good faith, cited by Bank of America and the bankruptcy administrator, are whether the plan is likely to "achieve a

result consistent with the objectives and purposes of the Bankruptcy Code" and exhibits "fundamental fairness in dealing with the creditors." In re W.R. Grace & Co., 475 B.R. 34, 87-88 (D. Del. 2012). Both Bank of America and the bankruptcy administrator argue that because one purpose of chapter 11 is to maximize property available to pay creditors, see Bank of Am. Nat'l Trust & Sav. Ass'n. V. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453, 119 S. Ct. 1411, 143 L. Ed. 2d 607 (1999), the Plan cannot have been proposed in good faith, as retention of the debtor's properties minimizes property that could be used to satisfy creditors.

However, according to the liquidation analysis attached to the debtor's disclosure statement, if all of the debtor's assets were liquidated, the debtor would have no money available for unsecured creditors after secured claims were paid. Retention of the Chase Properties therefore does not frustrate the goal of maximizing property to pay creditors; to the contrary, the Chase Properties are essential to fund the proposed payment to unsecured creditors under the Plan. Additionally, while maximizing assets available to creditors is undoubtedly one purpose of chapter 11, so is effective reorganization of a debtor. "Because the purpose of chapter 11 is to restructure the debtor's obligations and allow its business to continue, 'a plan is [generally] proposed in good faith if there is a reasonable likelihood that it will achieve a result consistent with the goals of the Bankruptcy Code.'" In re Gyro-Trac (USA), Inc., 441 B.R. 470, 479 (Bankr. D.S.C. 2010) (quoting Piece Goods Shops Co., 188 B.R. at 790).

Since filing his initial plan and disclosure statement, the debtor has surrendered two properties, and has engaged in negotiations with his secured creditors to develop a plan which each secured creditor finds acceptable. At the hearing, the debtor was willing to alter his personal

expenses, if required by the court, in order to achieve confirmation.[8] These negotiations and plan modifications reinforce the conclusion that the debtor has filed his plan in good faith in the desire to achieve a successful reorganization. See Gyro-Trac, 441 B.R. at 479. The Plan satisfies 11 U.S.C. § 1129(a)(3).

Feasibility

The feasibility requirement of a chapter 11 plan is the condition that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). It is the court's obligation to review a debtor's plan for feasibility notwithstanding a debtor's assurances that he will succeed. In re Renegade Holdings, Inc., 429 B.R. 502, 519 (Bankr. M.D.N.C. 2010). Bank of America argues that based on the balance in the debtor's DIP account after two years of segregating rental income and expenses associated with the Chase Properties,[9] the debtor would be unable to afford required payments to Chase under the Plan, thus making the Plan not feasible. If the debtor's monthly reports and DIP account statements are examined without any investigation into the context, nature, or cause of the post-petition expenses, the expenses associated with the Chase Properties would indeed appear higher than projected and too high to accommodate the mortgage payments to be paid to Chase under the Plan.

---

[8] The debtor's proposal to alter his "vacation fund" expenses will be discussed in further detail below in the court's analysis of the debtor's disposable income.

[9] At the hearing, the debtor testified that he had paid $24,000 in legal fees out of the DIP account. He also testified that he believed he had made two adequate protection payments to Chase out of the DIP account, but was unsure of the amount. Additionally, according to the debtor's monthly reports, he has paid various bankruptcy administrative fees out of the DIP account. Bank of America stated that it took these payments into account in its analysis of the DIP account balance.

However, the debtor's evidence shows that he incurred above-average business expenses since filing his bankruptcy petition. See Exhibit 1. One of the Chase Properties became infested with bed bugs in 2012, which necessitated additional cleaning and, when that was unsuccessful, new carpeting, bedding, and furniture for an entire room. The debtor also replaced his computer and printer in 2012 and does not foresee similar expenditures during the life of the Plan. Finally, the debtor became a certified pool technician in 2012, and plans to perform pool and hot tub maintenance on the Chase Properties beginning in 2013, thus reducing expenses. Section 1129(a)(11) does not require a debtor to guarantee his plan will be successful–"the possibility that a plan may fail is not fatal–but a plan must be supported by adequate evidence that some reasonable assurance of success exists." Gyro-Trac, 441 B.R. at 483 (citing In re Smith, 357 B.R. 60, 69 (Bankr. M.D.N.C. 2006)). The court finds that the debtor's evidence offers sufficient explanations of past expenses to satisfy the court that average expenses over the life of the Plan will be lower than they were in the first two years post-petition, and therefore within the projections of the Budget.

In addition to lowering business expenses, the debtor also testified that he was expecting income from the Chase Properties to be higher than projected in the Budget. The Budget indicates that the annual gross rental income of the Chase Properties will be $483,585.88, which is derived by averaging the gross rental income for each of the years 2008-2011 and the rentals through September 4, 2012. The debtor testified that the gross income for 2012 would actually be around $500,000. If this updated figure is used to calculate the average gross rental income for 2008-2012, the projected annual gross rental income for purposes of the debtor's Budget increases by $2,493.60

to $486,079.48.[10] This projection, which is accepted by the court, further supports the finding that the debtor's plan is feasible, despite the shortfalls that have occurred since the debtor filed his petition.

The bankruptcy administrator's feasibility objection was based upon concern over whether the debtor's income from the Chase Properties in 2012 would actually surpass projections (which the court has previously treated), and/or if the debtor is, in fact, entitled to the rental income from the Wilmington Condo. The court finds that although title to the Wilmington Condo is in the name of Alliance U.S. Properties, the debtor considers himself responsible for payments on, and entitled to income from, the Condo as part of his business. No contrary evidence was introduced, and there is a reasonable basis for the inclusion of this income. Therefore, the debtor correctly included the projected income of $7,800 per year in the calculation of gross income, and correctly included the payments to Chase for the Wilmington Condo in the "Mortgage Payments" line item of debtor's rental home expenses in the Budget. The Wilmington Condo does not produce a significant amount of income for the debtor, as the $7,800 annual rental income is not much higher than the $6,014[11] mortgage payment, but the Condo revenue does add a small amount of cushion for the debtor's business expenses and further supports a finding of feasibility.

Finally, the Plan provides for the surrender of additional properties if necessary, thus enabling the debtor to protect his ability to make payments under the Plan should one or more of the

---

[10] This higher gross rental income would also result in an increase in the debtor's line item for Treasure Management Fees of approximately $374.04 per year (15% of gross rental income), making the net increase in the debtor's business income $2,119.56 per year.

[11] This amount is reached by subtracting the debtor's annual mortgage payments on the Chase Properties under the Plan from the total amount the debtor lists as rental home mortgage expenses on the Budget.

11

properties not perform as anticipated. The debtor has satisfied his burden regarding feasibility of the Plan.

Projected Disposable Income

Pursuant to § 1129(a)(15)(B), if an unsecured creditor who will not be paid in full objects to confirmation, "the value of the property to be distributed under the plan [cannot be] less than the projected disposable income of the debtor" during the five years beginning on the date of the first plan payment, or during the entire period for which the plan provides payments, whichever is longer.[12] Bank of America and the bankruptcy administrator challenge the reasonableness of the debtor's personal household expenses listed in the Budget, which, if reduced, would result in higher disposable income and therefore a more significant distribution to unsecured creditors under the Plan. Although mention was made by either Bank of America or the bankruptcy administrator of three specific bases for objection to the debtor's expenses, i.e., his wife's student loans, son's college expenses and the vacation fund components, neither significant testimony or argument was proffered by them at the hearing regarding the student loans or college expenses.

Given the strong public policy in favor of the repayment of student loans, the court finds that the debtor's expenses for his wife's student loans are not unreasonable. Additionally, as a general rule, this court has found the support of a young adult child studying for a baccalaureate degree to be a reasonable expense. In re Mitchell, 2010 Bankr. LEXIS 4952 (Bankr. E.D.N.C. Dec. 22, 2010). The court therefore finds the inclusion of both the student loans and college expenses reasonable.

---

[12] Some courts have held that the language of § 1129(a)(15)(B) sets the debtor's projected disposable income as a minimum amount to be paid to *all* creditors under the plan. See, e.g., In re Simon, 2008 Bankr. LEXIS 2787 (Bankr. E.D. Va. July 29, 2008); In re Gordon, 465 B.R. 683, 693 (Bankr. N.D. Ga. 2012). The debtor calculated the propriety of his payment based on what would be paid to unsecured creditors under the Plan - a higher standard.

The court agrees with Bank of America and the bankruptcy administrator's concerns regarding the debtor's vacation fund, and finds that in the absence of any testimony tying the debtor's vacation expenses to medical conditions or the like, and weighing the propriety of such an expense against the rights of creditors to be repaid, the $1,800 per year expenditure is unreasonable. While the court will not unilaterally modify the debtor's Plan, the debtor, at the hearing, orally modified his plan to reduce that expenditure in the disposable income analysis to whatever lesser figure the court found reasonable. The court finds $500 per year to be a reasonable vacation fund; this reduction in the debtor's expenses will result in a $6,500 increase in the debtor's projected disposable income and a corresponding 27% increase in funds to be paid to unsecured creditors over the course of the Plan.

Thus, based on the debtor's oral modification of the Plan concerning the vacation fund, the court finds the Plan distributes no less than the debtor's projected disposable income to unsecured creditors, thereby satisfying § 1129(a)(15)(B).[13]

In light of the above, the court finds that the debtor has satisfied all of the requirements of § 1129(a), except for § 1129(a)(8), allowing the court to consider cram down under § 1129(b).

**Section 1129(b)**

If a plan satisfies all applicable requirements of § 1129(a) other than subsection (a)(8), the plan may nevertheless be confirmed if it does not discriminate unfairly and is fair and equitable with respect to the impaired rejecting class. 11 U.S.C. § 1129(b)(1). Section 1129(b)(2)(B) sets forth requirements for a plan to be fair and equitable to a class of unsecured creditors. If a class of

---

[13] As discussed below in further detail, the debtor will also be distributing an additional $15,000 to unsecured creditors upon the contribution of new value into the Plan by his non-debtor wife.

13

unsecured creditors does not receive value equal to the full amount of each claim in that class, the § 1129(b)(2)(B)(ii) "absolute priority rule" prohibits any holder of a claim or interest junior to the rejecting unsecured class from receiving or retaining property under the plan on account of its junior interest.

As noted above, the debtor has orally modified the Plan to provide for $15,000 to be paid into the Plan by his non-debtor wife on the date of confirmation. The debtor asserts that this contribution will satisfy the "new value exception" to the absolute priority rule, whereby the $15,000 is paid into the Plan in exchange for the right to retain equity in his properties through the Plan, despite the fact that unsecured creditors with more senior interests are not being paid in full. The new value is paid into the Plan by the debtor to essentially "repurchase" this old equity, so that the debtor may continue ownership of his assets "on account of a substantial, necessary, and fair new value contribution." In re RTJJ, Inc., 2013 Bankr. LEXIS 481 (Bankr. W.D.N.C. Feb. 6, 2013) (quoting In re Bonner Mall P'ship, 2 F.3d 899, 909 (9th Cir. 1993)).

Although circuits are split on the issue of whether the passage of the Bankruptcy Code effectively eliminated the applicability of the absolute priority rule to individual chapter 11 debtors, the Fourth Circuit has held that the absolute priority rule continues to apply to individual debtors. In re Maharaj, 681 F.3d 558, 563, 573-74 (4th Cir. 2012). The Maharaj court did not specifically address the new value exception and Bank of America maintains that its existence is unclear, but the court finds that the new value exception also survived the passage of the Bankruptcy Code and remains intact. RTJJ, Inc., 2013 Bankr. LEXIS 481; In re Eagan, 2013 Bankr. LEXIS 260 (Bankr. W.D.N.C. Jan 22, 2013); In re Deep River Warehouse Inc., 2005 Bankr. LEXIS 1793 (Bankr. M.D.N.C. Sept. 22, 2005); In re Grandfather Mt. Ltd. Pshp., 207 B.R. 475, 492 (Bankr. M.D.N.C.

1996); LW-SP2, L.P. v. Krisch Realty Assocs., L.P. (In re Krisch Realty Assocs., L.P.), 174 B.R. 914, 922 (Bankr. W.D. Va. 1994) (noting that "the Fourth Circuit left the door open for consideration of some 'limited new capital exception'"). While both the absolute priority rule and the new value exception make imminently more sense and are simpler to apply when a chapter 11 debtor is an entity and equity holders are seeking to retain their interests in the debtor, they both apply to individual chapter 11 debtors as well. Eagan, 2013 Bankr. LEXIS 260; see also Maharaj, 681 F.3d at 575 (suggesting that an individual debtor may comply with the absolute priority rule by contributing pre-petition property).

The standard used by courts in this circuit to determine the sufficiency of a proposed new value contribution requires that new value be: 1) new, 2) substantial, 3) in money or money's worth, 4) necessary for debtor's successful reorganization, and 5) reasonably equivalent to the value or interest received or retained as a result of the contribution. Bonner Mall, 2 F.3d at 909; RTJJ, Inc., 2013 Bankr. LEXIS 481; Eagan, 2013 Bankr. LEXIS 260; Grandfather Mt. Ltd. Pshp., 207 B.R. at 492. Neither Bank of America nor the bankruptcy administrator challenges that the $15,000 is "new" and "in money or money's worth," but both assert the debtor has failed to satisfy the remaining requirements for new value.

All three parties compare the $15,000 new value to the debtor's retained assets in their inquiries into the new value's substantiality and whether it is reasonably equivalent to the value received. See In re Henderson, 341 B.R. 783 (M.D. Fla. 2006). The debtor asserts that the new value is reasonably equivalent to the value of the non-exempt assets retained, which total $58,025,[14]

---

[14] The $58,025 figure is reached by including the debtor's estimated brokerage account balance of $8,700 into the calculation of non-exempt equity, based on the debtor's testimony that the account is not in fact exempt even though it was listed as exempt on the debtor's liquidation

15

and reiterates that under a liquidation analysis, if those non-exempt assets were liquidated, there would be no meaningful return to unsecured creditors; therefore, a contribution of $15,000 exceeds the value of what is being retained. Bank of America and the bankruptcy administrator contend that $15,000 is neither substantial nor reasonably equivalent to the value of the debtor's non-exempt assets,[15] much less the total value of equity retained (exempt and non-exempt), which equals $69,226.

The bankruptcy administrator also contends that the court should compare a new value contribution to "such things as" the total unsecured claims under the plan, the claims being discharged, and the effect the new value would have on the dividend being paid to unsecured creditors. In re Ambanc La Mesa Ltd. P'ship, 115 F.3d 650, 655 (9th Cir. 1997); Deep River Warehouse, 2005 Bankr. LEXIS 1793. When compared to the debtor's unsecured claims (estimated to be $5,043,959.22), the bankruptcy administrator asserts the new value contribution cannot be considered substantial.

The Bankruptcy Court for the Western District of North Carolina recently held that "there can be no formulaic approach for resolving [new value] issues in every situation." Eagan, 2013 Bankr. LEXIS 260. Like the court in Eagan, this court opts not to take the mechanical approach suggested by the parties in evaluating the debtor's proposed new value contribution. The analysis.

---

[15] Both Bank of America and the bankruptcy administrator assert that because the plan does not provide that the money in the DIP account will automatically go to Chase upon confirmation, the balance should be included in a calculation of the debtor's non-exempt assets. The court finds the money in the DIP account is Chase's cash collateral. The debtor testified that he would use the funds in the DIP account to reimburse Chase for expenses it paid on behalf of debtor post-petition *and* to pay ongoing expenses related to the Chase Properties, which expenses will last for thirty years after the effective date of the plan. The court finds the DIP account funds should not be included in the debtor's assets.

16

court finds that the appropriate analysis must account for factors such as the negative total net equity under the debtor's liquidation analysis and the absence of any equity whatsoever in the Chase Properties (which constitute the debtor's "going concern" he is seeking to retain through reorganization). See RTJJ, Inc., 2013 Bankr. LEXIS 481 (taking into account the fact that debtor's real estate assets were over encumbered when evaluating new value).

> The sufficiency of a new value contribution depends on the application of common sense to the circumstances presented in each unique case . . . The BAPCPA amendments were intended, in part, to keep individual debtors out of liquidation. Without "equity" such as shares or membership interests to offer an investor, however, an individual has far fewer options than a corporate debtor to raise new capital. . . .A reasonable middle ground must therefore be found if individual Chapter 11 cases are to retain any practical utility.

Eagan, 2013 Bankr. LEXIS 260.

Lastly, the court agrees with the debtor's contention that because the new value will go to unsecured creditors, it will ensure compliance with the projected disposable income provision of § 1129(a)(15)(B), and therefore is necessary for an effective reorganization. Additionally, the contribution will provide the debtor with enough capital to ensure that administrative expenses are paid. See RTJJ, Inc., 2013 Bankr. LEXIS 481. For the reasons explained above, the court finds that the proposed $15,000 contribution from the debtor's wife on the date of confirmation satisfies the applicable standards of new value.

Although the court finds that the debtor's proposed contribution satisfies the controlling standard for new value, it is worth noting that no one else has attempted to purchase the debtor's "equity." In LaSalle, 526 U.S. at 454, the United States Supreme Court upheld the denial of confirmation because a plan vested equity in the debtor's reorganized business in prior equity holders without giving any other party the opportunity to compete for that equity. See also In re

17

Brysuon Properties, XVIII, 961 F.2d 496, 504 (4th Cir. N.C. 1992) (reversing confirmation because, *inter alia*, under the plan the equity holders contributed new value without allowing any other party the right to bid on the equity). In other words, equity must be exposed to a market test, which "would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity[.]" LaSalle, 526 U.S. at 458; see also In re Graham & Currie Well Drilling Co., 2011 Bankr. LEXIS 4524 (Bankr. E.D.N.C. Nov. 1, 2011) (holding that "the appropriate value [of equity] must be determined by the market" and requiring debtor to notice creditors of proposed payment for equity so creditors would have opportunity to outbid the debtor). The debtor's exclusive right to propose a plan expired on August 11, 2011, nearly fifteen months before the confirmation hearing on the second amended plan. As the sole objecting creditor to the Plan, Bank of America had ample time to propose an alternate plan that offered more for the debtor's equity if it so chose, but it opted not to do so.

   The debtor's creditors were all served with the second amended plan, which was filed one-and-a-half months prior to the hearing and gave notice of debtor's intentions to meet the new value exception in order to retain his equity interest. Not one creditor has attempted to outbid the debtor on his proposed new value. The most likely explanation for this is the fact that a party who purchases a debtor's interests also undertakes the obligations linked to those interests, and in this case the debtor has no equity in his properties and little equity elsewhere. In re Smithville Crossing, LLC, 2012 Bankr. LEXIS 365 (Bankr. E.D.N.C. Jan 27, 2012). Regardless of the reason, the fact remains that there was opportunity for another party to file a plan with provisions to "purchase" the debtor's interest in the properties he contemplates retaining, but no such plan was proposed. This provides an alternative basis for this court's finding that the debtor has satisfied the new value

exception to the absolute priority rule, i.e., the equity was "exposed to the market" and no one outbid the debtor's offer of new value.

## CONCLUSION

For the foregoing reasons, the court finds that the debtor's Plan has been filed in good faith, is feasible, and, as amended at the hearing, dedicates all projected disposable income to unsecured creditors. The Plan also satisfies the absolute priority rule by successfully meeting the requirements of the new value exception. Therefore, the Plan will be **CONFIRMED.**

**SO ORDERED**.

**END OF DOCUMENT**